## WASHINGTON FIRE INS. CO. et al. v. COBB et al.

(Court of Civil Appeals of Texas. San Antonio. Jan. 7, 1914. Rehearing Denied Feb. 18, 1914.)

1. INSURANCE (§ 286*) — FIRE INSURANCE — WARRANTIES—BREACH.

The failure to communicate to the insurance company, upon insuring a sanitarium, the fact that the cook at the sanitarium, because of a personal grievance against the manager, and not because of any hostility to the institution, threatened to burn the sanitarium would not avoid the policy as a concealment of a material fact concerning the subject of the insurance, especially where the trouble between the cook and such manager of the sanitarium did not continue, and he afterwards sold the institution.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 652–655; Dec. Dig. § 286.*]

2. INSURANCE (§ 665*) — FIRE INSURANCE — CONCEALMENT OF FACT—SUFFICIENCY OF EVIDENCE.

Evidence *held* to sustain a finding that statements as to threats to burn a sanitarium which was insured had not been communicated to the insurer when he applied for a policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. § 665.*]

3. INSURANCE (§ 323*) — FIRE INSURANCE — WARRANTIES—MANNER OF OCCUPATION.

A provision in a policy insuring a building occupied as a sanitarium, "while occupied as the Park Terrace Sanitarium," in absence of provisions qualifying such intent, constituted a

warranty that the building would be occupied as a sanitarium during the life of the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 764–779; Dec. Dig. § 323.*]

4. INSURANCE (§ 323*) — FIRE INSURANCE — "OCCUPY."

The term "occupied," as used in a fire policy, implies an actual use by some person according to the purpose for which it is designed, and does not imply that some one shall remain in the building all of the time without interruption, but merely that there shall not be a cessation of occupancy for any considerable length of time.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 764–779; Dec. Dig. § 323.*

For other definitions, see Words and Phrases, vol. 6, pp. 4909, 4910.]

5. INSURANCE (§ 323*)—FIRE INSURANCE—OCCUPATION OF BUILDING.

A sanitarium which consisted of some 22 rooms and several cottages cannot be said to have been "occupied" during the months preceeding the fire, where during that time there was no attending physician, matron, or servants, and no facilities for heating the building, which then only contained three people, who were not authorized to receive patients or work for them, and who left about 26 hours before the fire, after which the building was in charge of a watchman.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 764–779; Dec. Dig. § 323.*]

6. INSURANCE (§ 606*) — SUBROGATION OF MORTGAGEE.

The rights of a lienholder and of the insurance companies under a provision in a fire policy that, whenever the company shall pay the mortgagee for any loss, and claim that no liability existed toward insured, the company should be subrogated to the rights of the party receiving payment, were not affected by the payment of premiums by the mortgagor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1504–1511, 1514–1516; Dec. Dig. § 606.*]

7. INSURANCE (§ 606*) — SUBROGATION OF MORTGAGEE.

Where the parties to a fire policy understood that a provision that, whenever the company paid the "mortgagee" any sum for loss and claimed that, as to the mortgagor or owner, no liability existed, the company should be subrogated to the rights of the party receiving payment as to all collateral securities was intended to cover a mechanic's lien on the premises, the insurance company, upon paying such lienor's claim, became subrogated to her rights as against the mortgagor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1504–1511, 1514–1516; Dec. Dig. § 606.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by R. S. Cobb against the Washington Fire Insurance Company and others, in which defendants filed a cross-bill impleading others. From a judgment for plaintiff, defendant named and others appeal. Affirmed as to two impleaded defendants, and reversed and remanded as to the other defendants.

Templeton, Brooks, Napier & Ogden, of San Antonio, and Crane & Crane, of Dallas, for appellants. A. L. Matlock and Butler L. Knight, both of San Antonio, for appellees.

MOURSUND, J.　R. S. Cobb sued the Washington Fire Insurance Company, Spring Garden Insurance Company, Southern National Insurance Company, Scottish Union & National Insurance Company, and J. C. Lamkin, alleging that Lamkin, on October 11, 1910, executed and delivered to Mrs. W. E. Wright two promissory notes for $1,000 each, due respectively one and two years after date, given in part payment for and secured by vendor's lien upon an undivided half interest in certain premises described in the petition and known as Park terrace, which notes were held and owned by plaintiff; that the defendant companies had executed insurance policies upon the improvements upon said premises, which policies were in force when said improvements were destroyed by fire on or about January 24, 1911, the policies being payable to Lamkin, but each of them contained a mortgage clause providing for payment to Mrs. Annie Blum as her interest might appear; that the lien held by Mrs. Blum was in the nature of a builder's and mechanic's lien executed by W. E. Wright et al. to C. T. Fincham and Beitel Lumber Company on August 6, 1908, and was therefore a prior lien to that of plaintiff; that, after the improvements were destroyed by fire, said companies paid Mrs. Blum her debt, amounting to about $6,000, thereby discharging their own debts and obligations, and each took an assignment or transfer from her of her lien proportionate to the amount paid by each, and said companies were claiming to be the owners of said mortgage indebtedness, and that the same was a superior lien to that of plaintiff. Plaintiff prayed that he have judgment for his debt, with foreclosure of his lien, and that the mortgage debt paid off by the companies be canceled, and, in the alternative, that, if the same should not be canceled, then that it be declared a second lien to that of plaintiff.

The insurance companies filed a joint answer, consisting of a general demurrer, a general denial, and a special answer admitting the issuance and payment of the policies as alleged by plaintiff, as well as the destruction of the property by fire on January 24, 1911, but alleging that each policy issued contained a mortgage clause, which provided, in substance, that the insurance should be payable to Mrs. Blum as her interest might appear, and, as to her, should not be invalidated by any act or neglect of the mortgagor or owner of the property, nor by foreclosure proceedings or notice of sale relating to the property, nor by the occupation of the premises for purposes more hazardous than permitted by the policy, and also contained the following clause: "Whenever this company shall pay the mortgagee (or trustee) any sum for loss or damage under this policy and shall claim that, as to

the mortgagor or owner, no liability therefor existed, this company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option pay to the mortgagee (or trustee) the whole principal due, or to grow due, on the mortgage, with interest, and shall thereupon receive the full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of her claim."

Said companies further alleged that said clause was inserted in each policy to secure Mrs. Blum in a first lien on said property, which was a builder's and mechanic's lien executed by W. E. Wright and wife and J. L. Hutchinson, and described in plaintiff's petition; that the indebtedness on August 22, 1911, amounted to $6,868.46, and on that date each company paid its proportional part of the same to Mrs. Blum, the amount paid by each company being set out; that, upon such payment being made, Mrs. Blum assigned such indebtedness and lien to said companies, whereby they became subrogated to the extent of their payments to all rights held by Mrs. Blum under said lien, as provided by the mortgage clause of said policies; that, as to Lamkin, said companies were not liable, because they contracted to insure him against loss to his building by fire while occupied as the Park Terrace Sanitarium, and that the use of such building as a sanitarium ceased prior to the destruction thereof by fire, and prior to the institution of the suit said companies tendered Lamkin the amounts of premium received by him, but he declined to accept same and surrender the policies as he was bound to do. They also alleged that each policy contained the following provisions: "This entire policy shall be void if the insured has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance or the subject thereof; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss. This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if the hazard be increased by any means within the control or knowledge of the insured. If any application, survey, plan or description of property be referred to in this policy, it shall be a part of the contract and a warranty by the insured."

The breach of such provisions by Lamkin was averred, the allegations being to the effect that prior to and subsequent to the issuance of the policies threats had been made by several persons living near the sanitarium to burn the same, which threats had been communicated to Lamkin, but that Lamkin did not disclose the same to any of said companies, although he knew they would not insure the property or continue the policies in force if they knew of such threats, but, on the contrary, willfully concealed said facts from the companies and their agents; that thereby Lamkin became guilty of concealing and misrepresenting in writing and otherwise a material fact or circumstance concerning the insurance and the subject thereof, and was guilty of fraud with respect to such insurance before and after the loss, rendering the policies null and void; that during the night of the ―――― of January, 1911, an attempt was made to burn up the property, but the fire was extinguished before much damage was done, but Lamkin, though knowing such attempt had been made, failed to notify the companies thereof, though knowing that they would immediately cancel the policies had they received such notice; that thereby Lamkin became guilty of fraud and concealment of a material fact and circumstance concerning such insurance and the subject thereof, and of fraud with respect thereto, rendering each policy null and void.

By way of further answer and cross-bill, the insurance companies impleaded W. E. Wright and wife, J. L. Hutchinson, R. S. Cobb, J. C. Lamkin, Roy M. Beitel, and Albert Beitel, alleging that on August 6, 1908, Mrs. Wright and J. L. Hutchinson owned the five acres described in plaintiff's petition, the metes and bounds thereof being given, and that they, joined by Mr. Wright, on said date executed and delivered to C. T. Fincham seven promissory notes aggregating $7,925, and, to secure the payment thereof, executed and delivered to him a builder's and mechanic's lien on the said premises; that said notes were indorsed by Fincham to Beitel Lumber Company, without recourse; that afterwards Beitel Lumber Company indorsed four of the notes to Mrs. Fannie Blum, guaranteeing the payment thereof, and assigned to her the builder's and mechanic's lien; that J. C. Lamkin acquired the property and assumed the payment of the notes, and, in addition, executed to Mrs. Wright the two notes for $1,000 each sued upon by plaintiff; that thereafter the insurance companies issued their policies to Lamkin, each of which contained a mortgage clause with loss payable to Mrs. Blum, and on or about January 24, 1911, the building was destroyed by fire, but, as to defendant Lamkin, the companies claimed that the policies were void for reasons heretofore set out; that they paid Mrs. Blum her debt, and the four notes, together with the lien, were transferred by her to the companies without recourse on her; that the Wrights and Hutchinson and Lamkin were each personally liable on the notes; that the notes had been declared due because of failure to pay interest due thereon as was authorized by the terms thereof. The insurance companies

prayed that they have judgment for their debt against the Wrights, Hutchinson, and Lamkin; that the policies be canceled; that Lamkin recover of the companies the sums paid by him as premiums; and that they have foreclosure of their lien as against plaintiff and the defendants other than themselves.

The Beitel Lumber Company pleaded that it held the third note of the series of seven notes secured by mechanic's and builder's lien, and that there remained unpaid a balance of $177.32, for which it prayed judgment, and also asked for foreclosure of lien against all other parties to the suit. Lamkin answered the cross-bill by plea in abatement and a general denial. Subject to the plea in abatement, he filed an answer consisting of a general demurrer to plaintiff's petition and the answers of Beitel Lumber Company and the insurance companies. In addition to a general denial, he adopted all the special defenses set up by plaintiff in his answer to the cross-bill of the insurance companies, and pleaded that the note held by Beitel Lumber Company had been paid. The Wrights answered by general demurrer and general denial.

Plaintiff filed an answer to the cross-bill, consisting of special exceptions, a general denial, and a plea that the payment by the insurance companies to Mrs. Blum was on behalf of Lamkin, and therefore the companies had no right to subrogation. The insurance companies dismissed as to Hutchinson, because no service was had upon him.

The case was submitted on special issues, and the jury found that the note held by Beitel Lumber Company had been paid; that Lamkin was not guilty of any fraud or wrongful concealment of material facts when he obtained the several policies of insurance or either of them; that at the time he secured the policies he did not know that threats had been made to burn the building, and that the sanitarium had not ceased to be used as a sanitarium for tuberculosis patients prior to or on January 24, 1911. The insurance companies filed a motion for judgment, notwithstanding the verdict, which was overruled. Judgment was entered that plaintiff recover of Lamkin his debt, establishing his lien upon an undivided half interest in the property as a first lien thereon, and awarding him foreclosure thereof as against all defendants; that Beitel Lumber Company and all the insurance companies take nothing; and that the builder's and mechanic's lien be canceled. The insurance companies have perfected an appeal.

By the first assignment of error it is contended the court erred in refusing to give special charge No. 3, requested by appellants, which was to return a verdict in favor of appellants upon the various issues on the ground that the undisputed evidence showed that threats to burn the property had been made and communicated to Lamkin prior to the issuance of the policies, and he had failed to inform the companies or their agents of such threats, though such fact was material and unknown to them.

The jury found against appellants upon the defense relied upon in the charge now being considered, and it becomes necessary to decide whether the testimony was of such a character that the court would have been authorized to say, as a matter of law, that the defense was established. Dr. Wright, when first testifying in behalf of appellants upon this issue, said he did not remember ever having told Lamkin about the threats made to burn the property. He modified this statement immediately by saying that he did tell Lamkin, as his attorney, of Mrs. Freeman, his cook, threatening to kill him, also to burn the house, if he did not turn it over to some one else and get out of business. This was upon an occasion when he tried to discharge her, and was, he thought, several months before he sold to Lamkin. He said the trouble "blew over" and she left, as far as he knew; there was no more trouble then. He did not know what became of her. He said he did not remember ever telling Lamkin of any threats other than those made by the cook. He thought he made no statement to Lamkin that would have caused Lamkin not to buy. When recalled, the witness said: "This old lady Fleming, I have testified about what she said; and of course I told him people had told me they had heard, if I didn't discontinue the business, the place would be probably burned down; I probably did tell Mr. Lamkin that before I sold to him, and while we were discussing the sale I think I told him."

Lamkin testified that Dr. Wright consulted him with reference to putting the cook under a peace bond, and told him she had threatened to kill a man working on the place and Dr. Wright, and that she had pulled a telephone off the wall. He advised against peace bond proceedings, and told Dr. Wright to get a policeman to protect his property and see that the cook behaved, which advice was taken; that later the cook brought suit to enjoin Dr. Wright from continuing the sanitarium, and procured a temporary injunction, which was afterwards dissolved. It does not appear that Lamkin was asked concerning other threats, or testified concerning the same.

[1] It appears that, as to the conversation between Wright and Lamkin concerning the threats made by the cook, the jury accepted Lamkin's version, which was to the effect that the threats communicated to him were threats to kill. But, were it conceded that Dr. Wright's version is true, the threat of the cook was on account of a grievance against Wright personally, and not on account of hostility to the institution, and was to be performed if he kept the sanitarium. He did not keep the sanitarium, and besides the trouble "blew over." We do not think

the failure to communicate such a threat, if made, under the circumstances existing when the policies were applied for, would constitute the misrepresentation of a material fact. It appears that Dr. Wright was told by people that they had heard, if he did not discontinue the sanitarium, it would probably be burned down. No one else made threats to Wright, nor does it appear that any one else made threats to Wright's informants, but rather that such informants were furnished opinions by people to the effect that, if Wright did not discontinue the sanitarium, it would probably be burned down. These hearsay opinions could furnish no basis for a claim that threats had been made. Besides, Wright at the utmost only thought he told Lamkin of such statements to him, and contradicted himself on the issue whether he even thought he had told Lamkin.

[2] The jury was justified in finding that the evidence failed to show that such statements had been communicated to Lamkin. The assignment is overruled.

By the second assignment complaint is made because special charge No. 2, requested by appellants, was not given, under which the jury would have been required to return a verdict for appellants on the ground that the undisputed evidence showed that, at the time the property was destroyed by fire, the same was not occupied as the Park Terrace Sanitarium. The contention having been made that the words "while occupied as the Park Terrace Sanitarium," used in connection with the description of the character and location of the property, constituted a warranty which had been violated by the building having ceased to be "occupied" as a sanitarium, the court submitted the issue whether the building "had ceased to be used as a sanitarium for tuberculosis patients prior to or on January 24, 1911." No objection was made to the submission of the issue nor the form in which the same was submitted.

[3] Apparently both parties construed the words "while occupied as the Park Terrace Sanitarium" to constitute a warranty, and, in the absence of other provisions qualifying such words, or showing an intent not to give such words the effect of a warranty, it appears that our courts have construed the same as constituting a warranty. Banking Ins. Co. v. Stone, 49 Tex. 4; Sun Mutual Ins. Co. v. Machine Co., 15 S. W. 34; Sun Ins. Co. v. Machine Co., 3 Willson, Civ. Cas. Ct. App. § 320; Shoe Company v. Insurance Co., 8 Tex. Civ. App. 237, 28 S. W. 1027. In the cases of East Texas Ins. Co. v. Kempner, 12 Tex. Civ. App. 540, 34 S. W. 393, and Phœnix Ins. Co. v. Cotton Machine Mfg. Co., 92 Tex. 297, 49 S. W. 222, the courts declined to hold certain statements to be warranties, because there were other clauses in the policies from which it could be ascertained that it was not the intent of the parties to create a warranty by the use of such statements. In this case the statement of facts does not contain the entire policies, and we fail to find in the portions thereof which were deemed material and embraced in the statement of facts, and which are copied in our statement of the pleadings of the parties, any words indicating an intent not to make the words "while occupied as the Park Terrace Sanitarium" a warranty. We therefore feel constrained to hold, under the authorities cited, that said words constituted a warranty to the effect that the building would be occupied as a sanitarium during the life of the policy. In order to decide whether the facts show, as a matter of law, that said warranty was breached, we must determine what was required of the insured, and then see whether the facts show that such requirement was complied with. In the case of Georgia Home Insurance Co. v. Brady, 41 S. W. 513, this court approved a definition of occupancy, in a case wherein the building insured was a dwelling, as "such an occupancy as the parties must be presumed to have intended— that is, a practical occupancy, consistent with the purpose for which the property was insured—and mere temporary absence from the premises by plaintiff or the members of his family does not operate as a breach of the obligation to occupy said premises, provided you believe from the testimony that such absence was a contingency which may fairly be said to have been within the contemplation of the parties." In the case of East Texas Ins. Co. v. Smith, 3 Willson, Civ. Cas. Ct. App. § 282, the following rule was quoted with approval from Wood on Fire Insurance: "A practical occupancy consistent with the purposes for which it was insured is intended, and an occupancy that measurably lessens the vigilance and care that would be incident to its use for such purposes is not an occupancy within the meaning of the term as thus employed. The intent of the parties in respect to occupancy is to be gathered from the usual and ordinary use of the premises for the purposes to which they are devoted."

[4] From Cooley's excellent work, entitled Briefs on the Law of Insurance, we take the following rules: "Occupied implies an actual use by some person or persons, according to the purpose for which the building is designed." "The use and occupancy which will satisfy the condition must be of such character as ordinarily pertains to the purpose to which the building is adapted or devoted." "The word does not, however, imply that some person must be in the building all the time, without interruption, but merely that there must be no cessation of occupancy for any considerable length of time." "In determining whether the continuity of occupancy is completely broken, the intent of the occupant is an important factor, but even an intent to return will not suffice to save a forfeiture if there is an absence for an unreasonable or a considerable length of time."

See, also, notes to Knowlton v. Insurance Co., 2 L. R. A. (N. S.) 517; Insurance Co. v. Buchanan, 4 L. R. A. (N. S.) 765.

The evidence upon the issue of occupancy, briefly stated, was as follows: Mrs. Chakas, witness for appellants, testified that she was a patient in the sanitarium until March 24, 1910; that then she became a nurse in such sanitarium and nursed Chakas, who married her on December 12, 1910; that on October 11, 1910, she moved to Dr. Wright's home; that this was after Wright sold to Lamkin; on November 4th she moved back to the sanitarium, at which time it contained five or six patients, but she only had charge of Chakas; that it was closed as a hospital on December 18, 1910, but she and her husband stayed there and kept house until January 23, 1911, at the request of Lamkin, in the capacity of caretakers of the property, he stating that it was necessary to keep some one there on account of the insurance; that the upper part of the building was closed up, and they lived in the lower portion; that Lamkin told her to get her a companion, but not any one who was sick, and she got Miss Bertha Little, who also stayed until January 23, 1911; that in the early part of January a terrible freeze occurred, and they put in a small heater which they found in one of the cottages, running the pipe through a piece of tin over half of the window; that when the sanitarium was in operation, as a rule, they had a cook, and witness was nurse, while the sanitarium was in charge of Mrs. Stovall, the matron; that Lamkin consulted her about the needs of the hospital after buying it, and she told him he had a Jonah on his hands, and he told her he bought the property as a real estate speculation, and that the house had no value to him because it had been used as a tuberculosis sanitarium, and he regarded it as a nuisance; that an attempt was made to burn the building about 8 o'clock on the evening of January 22, 1911, the fire being extinguished by them, and on the next day they moved out; that the last prescription she obtained from Dr. Wright was for her husband early in January.

Dr. Wright testified that his connection with the sanitarium ceased when he sold it, but he still had patients there; that Mr. and Mrs. Chakas were patients of his, and he treated them up to the time they left the property, having paid them a visit the day before they left, and that there was another patient in the sanitarium up to probably a week or ten days before the fire. He did not know of any change in the name of the institution after he sold it. During the time he ran it, he had as many as 20 to 25 patients at a time. He was in charge of the sanitarium and treated these patients. The sanitarium had 22 rooms, including the little houses, and had some cottages outside where incurable patients were located.

Lamkin testified: "Mrs. Stovall, my matron out there, first notified me she was going to leave on the 16th of December, 1910. I have in my pocket the original note she wrote me at the time, telling me she was going to leave the property December 16th; and she did leave the sanitarium, I imagine, about the 18th. I think she was there a short time after. After I bought the sanitarium from Dr. Wright, I operated it as long as it existed, as such. I did not make arrangements with Mrs. Chakas and her husband to remain in the building as caretakers after Mrs. Stovall left. I will explain that I did so: After Mrs. Stovall wrote me that note she was going to leave the sanitarium, I received a note from Mrs. Chakas, in which she said or made known to me Mr. and Mrs. Chakas' keep was paid up to and inclusive of December 25, 1910. Mrs. Stovall wrote me, and Mrs. Chakas wrote me on the 16th of December, that I could refund her the difference owing up to the 25th, the amount they had paid, and what they had coming, under arrangement with Tom Chakas, brother of Mike Chakas, who paid me for Mike's keep. She said in this same note she hated very much to leave the sanitarium. I have the note here, if you want to see it. Later, I don't know whether she called me or I called her—she says I called her; perhaps I did—why, I said to her if she wanted to remain there, why, I was going to Houston for the holidays, and that she might continue, she and her husband, to occupy and use the groceries there in the property, and that, when I returned, why then I would see her, and, if we owed her anything, I would refund it; and she concluded to do that. She remained there. I went to Houston, took advantage of the rates and took my family to Houston, and took advantage of the ticket that didn't expire, my recollection is, until the 3d of January, when I returned to San Antonio and got busy with Mrs. Wahrmund to use her as my matron there; but, before I got Mrs. Wahrmund established in the sanitarium, it was destroyed by fire. During the time I was away, my servants continued with me there. Mrs. Stovall left, but Ziegler, the man cook, I paid him up and he left during Christmas, and I told Mrs. Chakas I didn't intend to put any more patients in there until my return after the holidays. It is a fact I put no patients in there at the time I left for Houston, and none put in there, to my knowledge, from that time until the fire occurred. Yes; I had pay patients in there in December; I can't tell how many. Mrs. Gibson remained, was the last to leave; wife of a doctor of Beaumont. She left, I think, several days after Mrs. Stovall left the property. My remembrance is those patients that were in there were all able to travel and go home for the holidays except one, Mrs. Gibson, and that she was practically bedridden; but she compelled herself to go, and got out anyway, I think a few days after Christmas. No; there were no patients in there during

the month of January. I sent patients out there to look over the property, with the view of putting them in later, when I got this matron in there and got things arranged."

He also testified: "I employed Mrs. Morman as matron to succeed Mrs. Stovall. I have a card of hers here. I did employ another matron to take charge of the sanitarium. She came here from the Baldwin Sanitarium, El Paso—had previous experience in the same line of work; and I expected to continue the sanitarium here under the management of Dr. Theo. Y. Hull, who is regarded as a leading tubercular specialist in the South. I made efforts to obtain patients in December and January. Only two patients were consulted in person. One was a young man, I don't remember his name, that worked for the Emerson Loan Company; the other, the brother-in-law of a very handsome lady connected with the curio store on Alamo Plaza—could get names— not necessary to tell what I told them. I did not state to Mrs. Chakas I didn't want any sick people to go in there, and she never mentioned the fact to me of her putting anybody in there 'as a companion.' I did not know until the first attempt to burn the property that this lady, Miss Little, she speaks of, was in there." Lamkin also testified he did not know of any heating stoves ever being placed in the building, except oil stoves, all of which were finally taken out. When Mrs. Chakas moved out, Lamkin locked the front door and took the key. At the time the house was burned, it still had the furniture and all the equipment for a sanitarium in it.

[5] Considering the size and nature of the building used as the Park Terrace Sanitarium, the manner in which the institution had been conducted, and the general nature of the business, it cannot be said that the occupancy during the month preceding the fire was of the character contemplated by the insurers when entering into the contract. During said time, there was no attending physician, matron, cook, or servants, and no facilities for heating the building in the middle of winter; in fact there were three people in the building who made their residence there and who were not authorized to receive patients, nor employed to wait upon, cook for, or nurse them. They remained until about 26 hours before the fire, after which the building was only in charge of a watchman. We think reasonable minds must concur in the conclusion that the use of the premises as a sanitarium ceased about a month prior to the destruction thereof, and the next question is whether the cessation was of such duration as to forfeit the policy. The jury was authorized to find from Lamkin's testimony that he intended to resume the operation of the sanitarium. Where a dwelling is insured, temporary absences of the family are within the contemplation of the parties, and, where mills and manufactories are insured, temporary suspensions of business are contemplated. With a sanitarium it might be contemplated that a temporary suspension would take place if necessary for repairs to the building, but it surely was not contemplated that, if the matron quit, the owner could close down and take such time as he wished in order to get a desirable matron. The matron gave notice on December 16th that she would leave. After nearly a month and a half, no other matron had been installed. When a building is insured while occupied for a certain business, it is contemplated that the business will be continued, and, while suspensions may take place owing to exigencies arising from the necessity of making repairs or from the nature of the business, yet we do not think that in this case the facts are such as to justify a finding that the suspension of the use of the building as a sanitarium was of reasonable duration. It was incumbent upon Lamkin to use diligence to have the building occupied as a sanitarium, and, if he found that he could not do so within a reasonable time, he should have applied for the consent of the companies to allow the building to remain unoccupied for a certain time or for permission to change the nature of the occupancy. The care and vigilance that would have accompanied the use of the property as a sanitarium was a material element entering into the contract, and could not be dispensed with for a month without the consent of the companies. We have read many cases wherein the question arose whether a building was "occupied" at the time it was destroyed, but have found none where a building used as a hospital or sanitarium was insured. It would be of little benefit to discuss cases where dwellings, stores, mills, or manufactories have been insured, because the nature of the use is entirely different from that of a sanitarium. We conclude that the evidence is undisputed that the building had ceased to be occupied as a sanitarium for a month or more before its destruction, and that such period of time was unreasonable in view of the nature of the business to be conducted in the building.

We are therefore of the opinion that the insurance upon the building was void as to Lamkin. The companies contend that, such being the case, they are the legal owners and holders of the lien held by Mrs. Blum, which is a prior lien to that of appellee Cobb.

[6] The policies provide for the companies becoming subrogated to Mrs. Blum's lien if they pay off her claim, when no liability exists as to the insured. The rights of Mrs. Blum and those of the companies under this clause are not affected by the fact that Lamkin paid the premiums. Cooley's Briefs on the Law of Insurance, pp. 1525, 1526. It is contended that no subrogation took place in this instance because the policies do not

provide for a builder's and mechanic's lien, but only a mortgage lien. In support of this position, we are cited to the case of Burton-Lingo Co. v. Patton (N. M.) 107 Pac. 679, 27 L. R. A. (N. S.) 420. The clause therein construed was one providing for forfeiture if foreclosure proceedings be brought "by virtue of any mortgage or deed of trust." The court refused to extend this provision so as to embrace the foreclosure of a mechanic's lien, construing the words of the clause strictly against the insurance company, as was correct. We are not now construing a forfeiture clause, but one giving Mrs. Blum certain rights and the companies certain rights. The lien held by Mrs. Blum was a builder's and mechanic's lien in writing, under the terms of which insurance was required to be carried, and there is not even a contention that said lien was not the one meant by the parties to the insurance contracts.

[7] All parties fully understood that said lien was meant, and there can be no doubt that, had the companies refused to pay Mrs. Blum, she could have recovered a judgment against them upon such clause, and that, having paid her, they became subrogated to her lien as in such clause provided.

The judgment, therefore, cannot be sustained, upon the theory that appellants did not become subrogated to the claim and lien held by Mrs. Blum.

The remaining assignments of error relate to the issues of fact already discussed, and it is unnecessary to write our conclusion as to each of them.

The judgment will be affirmed as to the disposition made of the defendants Albert Beitel and Roy M. Beitel, partners under the firm name of Beitel Lumber Company, and as to all other issues the same is reversed and the cause remanded.